RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0027P (6th Cir.)
File Name: 02a0027p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

INTERNATIONAL UNION,
UNITED AUTOMOBILE,
AEROSPACE, AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA,
                  *Plaintiff-Appellee,*

> No. 00-4167

        *v.*

DANA CORPORATION,
           *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 99-07603—James G. Carr, District Judge.

Argued: November 2, 2001

Decided and Filed: January 22, 2002

Before: KEITH, BOGGS, and MOORE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Stanley J. Brown, HOGAN & HARTSON, McLean, Virginia, for Appellant. Catherine J. Trafton, ASSOCIATE GENERAL COUNSEL INTERNATIONAL

1

UNION, UAW, Detroit, Michigan, for Appellee.
**ON BRIEF:** Stanley J. Brown, Michael J. Lorenger, HOGAN & HARTSON, McLean, Virginia, Richard S. Walinski, Meredith L. Mercurio, COOPER & WALINSKI, Toledo, Ohio, for Appellant. Catherine J. Trafton, Michael B. Nicholson, ASSOCIATE GENERAL COUNSEL INTERNATIONAL UNION, UAW, Detroit, Michigan, for Appellee.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge. Defendant-Appellant Dana Corporation appeals from an order of the district court granting summary judgment to Plaintiff-Appellee International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW"). In 1999, the UAW filed a claim in federal district court against Dana pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), to enforce an arbitration award finding Dana in breach of the collective bargaining agreement between Dana and the UAW. Dana filed a counter-claim, alleging that the arbitration award was invalid because the arbitrator's interpretation of a neutrality provision in the collective bargaining agreement differed from that of a previous arbitrator. Both parties moved for summary judgment, and the district court granted the UAW's motion. For the following reasons, we **AFFIRM** the district court's judgment.

### I.  BACKGROUND

Dana Corporation, a manufacturer of automobile parts, and the UAW are parties to a collective bargaining agreement ("Master Agreement") that covers several of Dana's plants.[1] The Master Agreement contains provisions for the arbitration

———————————

[1]The Master Agreement was most recently renegotiated in 1998.

F.3d 450, 456 (6th Cir. 2001).[13]  Finally Dana alleges that Arbitrator Glendon's interpretation of the neutrality provision effects a waiver of its statutorily protected rights under § 8(c) of the NLRA, 29 U.S.C. § 158(c).  As we discussed earlier, however, § 8(c) does not protect an employer from agreeing not to express its views.  In fact, far from recognizing § 8(c) as codifying "an absolute right" of an employer to convey its view regarding unionization to its employees, see Appellant's Br. at 45, we have stated that an expression of an employer's views or opinion under § 8(c) is merely "permissible." *NLRB v. St. Francis Healthcare Ctr.*, 212 F.3d 945, 954 (6th Cir. 2000).

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the order of the district court granting summary judgment to the UAW.

---

[13]We have recognized exceptions to this requirement. *See Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987).  A litigant may assert the rights of third parties where the third party's "enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue" and where the third party is not as able to assert the right. *Id.*  In this case, even if Dana's employees' rights and the activities Dana wishes to pursue were inextricably intertwined, Dana's employees would still be able to assert their rights themselves. *See Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 488-89 (9th Cir. 1996) (holding that an employer attempting to assert rights on behalf of its employees did not have standing because the employees could assert their rights themselves).

of grievances, including the selection of a permanent arbitrator by agreement of the parties.  In regard to decisions made by the permanent arbitrator, the Master Agreement provides that:

> In deciding a case, it shall be the function of the Arbitrator to interpret the Agreement and all Supplemental Agreements thereto and to decide whether or not there has been a violation thereof.  He shall have no right to change, add to, subtract from, or modify any of the terms of this Agreement or any Supplemental Agreements thereto . . . .

Joint Appendix ("J.A.") at 207 (Master Agreement).  The Master Agreement further provides that decisions of the permanent arbitrator "shall be final and binding upon both the Union and the Company."  J.A. at 207.  A side letter to the Master Agreement, first negotiated in 1976,[2] governs Dana's conduct when the UAW seeks to organize a Dana plant whose employees are not represented by a union.  In the letter, Dana agreed that:

> Where the UAW becomes involved in matters relating to the representation of our employees, we intend to continue our commitment of maintaining a neutral position on this matter.  The Company and/or its representatives will communicate with our employees, not in an anti-UAW manner, but in a positive pro-Dana manner.

J.A. at 92 (Neutrality Letter).  Dana also stated in the letter that "[w]e have no objection to the UAW becoming or remaining the bargaining representative of our people as a result of such as [sic] election."  J.A. at 92.  But Dana did stipulate that " we reserve the right to speak out in any

---

[2]The letter was amended three times, in 1979, 1980, and 1983, and was thereafter adopted without amendment each year the parties negotiated the Master Agreement.

manner appropriate when undue provocation is evident in a representation campaign." J.A. at 93.[3]

In arbitration awards in 1981, 1994, and two in 1997, permanent arbitrator Richard Mittenthal interpreted the neutrality provision of the side letter. The 1981 arbitration arose out of a grievance filed by the UAW, alleging that Dana, through its wholly owned subsidiary Wix, had violated the neutrality provision in opposing the UAW's organizational campaign at Wix plants in Gastonia, North Carolina. Arbitrator Mittenthal began his arbitration opinion by noting that:

> Dana concedes that where the UAW attempts to organize a Dana facility, Dana must "maintain . . . a neutral position on this matter . . ." True neutrality would mean, of course, that Dana would take no stand on the question of union representation. It could not be for or against the UAW. But that kind of strict neutrality does not appear to have been contemplated by the parties. Dana did not commit itself to silence. Rather, it was permitted by the "Neutrality Letter" to "communicate with . . . employees, not in an anti-UAW manner, but in a positive pro-Dana manner."

J.A. at 100 (1981 Arbitration). He then stated that:

> [T]he parties agree that Dana is free to express opposition to the UAW provided its argument is not couched in anti-UAW language.

---

[3]A note to the side letter requires that disputes between Dana and the UAW regarding its provisions be submitted to arbitration:
> All disputes involving neutrality will be submitted to the Arbitrator for resolution. The Arbitrator's decision shall be final and binding. Neither party shall resort to legal action as a result of a dispute involving past or future conduct regarding neutrality. The only time legal action would be appropriate would be when one party failed to abide by the Arbitrator's decision and such failure was determined by the Arbitrator.

J.A. at 93 (Neutrality Letter).

---

Dana's argument that Arbitrator Glendon's interpretation of the neutrality provision effects a waiver of its and its employees' statutorily protected rights is without merit. Dana alleges that Arbitrator Glendon's interpretation of the neutrality provision effects a waiver of its employees' statutorily protected rights under § 7 of the NLRA, 29 U.S.C. § 157. We have said that waivers by unions of employee rights under § 7 must be "clear and unmistakable." *NLRB v. Mead Corp.*, 73 F.3d 74, 79 (6th Cir. 1996). However, Dana does not point to any specific right under § 7 that Arbitrator Glendon's interpretation of the neutrality provision could effectively waive. Dana argues that "the UAW . . . under the Glendon standard, limits the rights of unrepresented, unknown, and unknowing employees to hear all sides of the labor-management debate." Appellant's Br. at 44. As § 7 grants *employees* the right to organize or to refrain from organizing, however, it is unclear how any limitation on Dana's behavior during a UAW organizational campaign could affect Dana's employees' § 7 rights.[12] In addition, Dana does not have standing to litigate claims in federal court on behalf of its employees. One of the prudential requirements of Article III standing is that "a plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see also Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249

---

216 (2000).

[12]Section 7 provides that:
> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities . . . .

29 U.S.C. § 157.

(quotation omitted). Thus, inasmuch as Dana, under Arbitrator Glendon's interpretation, may only remind employees of the benefits they already enjoy, it perhaps has lost some of its ability to argue effectively against the union. However, Dana voluntarily agreed to the neutrality provision, the resolution of disputes regarding the provision through arbitration, and the permanent arbitrator, and an employer's voluntary agreement to silence itself during union organizing campaigns does not violate federal labor policy. One circuit has expressly decided that neutrality agreements requiring employers to limit their communication with employees do not violate federal labor policy. The Ninth Circuit has held that "[n]othing in the relevant statutes or NLRB decisions suggests employers may not agree to remain silent during a union's organizational campaign — something the employer is certainly free to do in the absence of such an agreement." *Hotel Employees Union, Local 2 v. Marriott Corp.*, 961 F.2d 1464, 1470 (9th Cir. 1992). The court also noted that neutrality agreements were not inconsistent with § 8(c), as that section "merely states an employer does not commit an unfair labor practice by expressing its views regarding unionization. This provision does not suggest an employer's agreement not to express its views is unenforceable." *Id.* at 1470 n.9. And neutrality agreements have been upheld without contest in this and other circuits. *See AK Steel Corp. v. United Steelworkers*, 163 F.3d 403, 406 (6th Cir. 1998) (agreement preventing an employer from "demean[ing] the Union as an organization or its representatives as individuals" and interpretation preventing anti-union communication by employer upheld); *Hotel & Rest. Employees Union Local 217 v. J.P. Morgan Hotel*, 996 F.2d 561, 563 (2nd Cir. 1993) (agreement preventing an employer from interfering with union organizing effort or mounting a campaign with its employees opposing the union upheld).[11]

---

[11] Academic commentators have also noted that neutrality agreements are enforceable in federal courts. *See* Charles I. Cohen, *Neutrality Agreements: Will the NLRB Sanction Its Own Obsolescence?*, 16 Lab. Law. 201, 204 (2000); George N. Davies, *Neutrality Agreements: Basic Principles of Enforcement and Available Remedies*, 16 Lab. Law. 215,

This may seem, at first blush, a contradiction in terms. But what the parties appear to have had in mind is that Dana argue its case in an objective high-minded fashion without resort to the kind of threats and innuendos which have often accompanied employer speech in organizing campaigns.

J.A. at 101. Because he found that Dana, through Wix, had expressed its opposition to the UAW in explicit anti-UAW terms and that the UAW had not unduly provoked Dana, Arbitrator Mittenthal concluded that Dana had violated the neutrality provision.

The 1994 arbitration arose out of a similar grievance filed by the UAW involving the organization of a Dana plant in Gordonsville, Tennessee. In his arbitration opinion, Arbitrator Mittenthal cited extensively from his 1981 opinion, and he expanded on his earlier interpretation of the provision only by noting that "anti-UAW" means *any* anti-UAW statements — truthful or untruthful. J.A. at 113 (1994 Arbitration). Arbitrator Mittenthal again concluded that Dana had violated the neutrality provision in making explicitly anti-UAW statements to its employees without undue provocation. The 1997 arbitrations involved Dana plants in Morganton, North Carolina, and Cape Girardeau, Missouri. In both, Arbitrator Mittenthal reiterated his earlier interpretation of the neutrality provision, and, as in the 1981 and 1994 arbitrations, he found that Dana had violated the provision.

In 1998, the UAW attempted to organize the Dana plant in Greensboro, North Carolina. On September 4, 1998, the UAW filed a grievance with the new permanent arbitrator, Paul E. Glendon, charging Dana with twelve violations of the neutrality provision. In April and June of 1999, Arbitrator Glendon held hearings, and on September 17, 1999, he issued an award for the UAW on five of the twelve charges. Arbitrator Glendon began his arbitration opinion by discussing the arbitral history of the neutrality provision; although he recognized that Arbitrator Mittenthal's interpretation of the provision "had been part of the parties'

collective bargaining relationship for seventeen years" and that "questions of whether the Corporation violated the Neutrality Letter at Greensboro . . . must be answered with this arbitral history in mind," J.A. at 149 (1999 Arbitration), he stated that:

> The Corporation's promises that it has "no objection to the UAW becoming or remaining the bargaining representative of our people as a result of [an NLRB] election," will "continue [its] commitment of maintaining a neutral position on this matter," and "will communicate with . . . employees, not in an anti-UAW manner, but in a positive pro-Dana manner" indeed are clear and unambiguous, and to this arbitrator it is not just difficult, but impossible, to reconcile with [sic] them with *any* communication of outright *opposition* "to the UAW becoming the bargaining representative of our people."

J.A. at 147 (1999 Arbitration). In regard to three of the five charges he sustained, though, Arbitrator Glendon expressly invoked the interpretation of the neutrality provision developed by Arbitrator Mittenthal. On the first charge, Arbitrator Glendon found that Dana had violated the neutrality provision because it had communicated a link between union representation and loss of job security to its employees. J.A. at 151-52. Arbitrator Glendon cited Arbitrator Mittenthal's February 13, 1997 arbitration opinion for the proposition that linking union representation with a loss of jobs "can hardly be viewed as 'communica[tion] . . . in a positive pro-Dana manner.' It is a thinly veiled attempt to associate the UAW with inefficiency and poor productivity. It is 'anti-UAW.'" J.A. at 151 (1999 Arbitration) (quoting Feb. 13, 1997 Arbitration, J.A. at 127). Similarly, on the second and third charges, Arbitrator Glendon found that Dana had violated the neutrality provision because it had made explicitly anti-UAW statements to its employees. J.A. at 154, 157 (1999 Arbitration).

be a reasonable construction of ambiguous terms. Thus, we conclude that Arbitrator Glendon's arbitration award draws its essence from the Master Agreement.

## C. Public Policy

Dana also argues on appeal that, as interpreted by Arbitrator Glendon, the neutrality provision "effectively silences" Dana during the UAW organizing campaigns. Appellant's Br. at 33. Such silence, Dana further contends, is contrary to federal labor policy and effects a waiver of Dana's and its employees' statutorily protected rights. We have held that where "an arbitration award is challenged on public policy grounds, the court must determine whether the arbitrator's interpretation of the contract jeopardizes a well-defined and dominant public policy, taking the facts as found by the arbitrator." *MidMichigan Reg'l Med. Ctr.-Clare*, 183 F.3d at 504 (quotation omitted). The Supreme Court has also recently held that "[w]e agree, in principle, that courts' authority to invoke the public policy exception is not limited solely to instances where the arbitration award itself violates positive law. Nevertheless, the public policy exception is narrow . . . ." *E. Associated Coal Corp. v. UMW, District 17*, 531 U.S. 57, 63 (2000). Dana alleges specifically that the neutrality provision as interpreted by Arbitrator Glendon violates § 8(c) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(c). Section 8(c) states that the expressing of views — without threat of reprisal or promise of benefit — does not constitute evidence of unfair labor practice. 29 U.S.C. § 158(c); *see also NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 368-70 (6th Cir. 1993) (non-coercive but generally anti-union statements by employer are not unfair labor practices under § 8(c)).

It is possible that the neutrality provision does somewhat silence Dana, but we conclude that the neutrality provision does not violate federal labor policy. We have noted that "the only effective way of arguing against the union is for the company to point out to the workers the adverse consequences of unionization . . . ." *Pentre*, 998 F.2d at 369

difficult, but *impossible*, to reconcile [Dana's statements during the UAW's Greensboro organizing campaign] with the "no objection" pledge in particular and the commitment of neutrality in general."   J.A. at 163 (1999 Arbitration) (emphasis in original).  But as the *Hotel Ass'n* court noted, "[i]f the Employer is unhappy with the present [collective bargaining agreement] it can bargain over changing it — to make provision for a system of precedent, or to use a single arbitrator, or otherwise.  It may not expect this court, however, to serve as the *deus ex machina* that delivers it from the consequences of the present agreement." *Hotel Ass'n*, 963 F.2d at 391.

Having concluded that it was within the scope of Arbitrator Glendon's authority not to adhere to Arbitrator Mittenthal's interpretation of the neutrality provision, we must assess whether Arbitrator Glendon's interpretation of the provision independently draws its essence from the provision.  In the neutrality side letter to the Master Agreement, Dana pledged that:

> Where the UAW becomes involved in matters relating to the representation of our employees, we intend to continue our commitment of maintaining a neutral position on this matter.  The Company and/or its representatives will communicate with our employees, not in an anti-UAW manner, but in a positive pro-Dana manner.

J.A. at 92 (Neutrality Letter).  As discussed above, Arbitrator Glendon interpreted "anti-UAW" and "positive pro-Dana" to preclude *all* anti-union communication — not just anti-UAW communication (as Arbitrator Mittenthal had interpreted the provision).  Such an interpretation, on its face, does not appear to:  (1) conflict with the express terms of the agreement; (2) impose additional requirements not expressly provided for in the agreement; (3) fail to be rationally supported by or derived from the agreement; or (4) be based on general terms of fairness and equity instead of the exact terms of the agreement.  Instead, the interpretation seems to

In regard to the sixth charge, Arbitrator Glendon expressly rejected Arbitrator Mittenthal's interpretation of the neutrality provision.  The sixth charge involved a letter sent by the plant manager, Ralph Bash, to the employees stating that Dana was "absolutely opposed" to the unionization of the employees at the plant and describing how joining the union would negatively affect the employees.   J.A. at 161-62 (1999 Arbitration).[4]   Arbitrator Glendon found that although the letter was not explicitly "anti-UAW" and would perhaps have been permissible under Arbitrator Mittenthal's interpretation of the neutrality provision, "it is not only difficult, but *impossible*, to reconcile such statements with the 'no objection' pledge in particular and the commitment of neutrality in general."  J.A. at 163 (emphasis in original).  Arbitrator Glendon further concluded that:

> It is certainly true that the Corporation is not sentenced to silence in a UAW organizing campaign, but what the Neutrality Letter permits by way of pro-Dana communication is, at most, a statement by management to employees at a plant facing an organizational campaign that Dana has no objection to the UAW representing them but wishes to remind them of the benefits they already enjoy without such representation.

J.A. at 163. Finally, in regard to the twelfth charge, Arbitrator Glendon found that Dana's violation of the neutrality provision in its "outright, absolute and strident opposition to the UAW representation of employees at the Greensboro Plant and by various anti-UAW communications to such employees" effected the constructive discharge of employee Crystal Windsor.  J.A. at 172-74.  Arbitrator Glendon did not

---

[4]For instance, the letter stated that"[u]nions . . . want to lock companies up into restrictive contracts that could make us inflexible and non-productive.  This does not help employees."  J.A. at 161.  And it stated that "[t]he union will be able to make decisions for you.  You will have to live with those decisions, whether you agree or not.  It will be like giving others a blank check to make decisions about your future." J.A. at 161.

explain which interpretation he relied on in his conclusion regarding the twelfth charge, but it is possible that Arbitrator Mittenthal would not have come to the same conclusion.

On September 24, 1999, the UAW filed a claim in the United States District Court for the Northern District of Ohio pursuant to the Labor Management Relations Act, 29 U.S.C. § 185(a), to enforce Arbitrator Glendon's award. Dana counterclaimed to vacate the award on October 18, 1999, and the cases were consolidated in the district court. On December 15, 1999, the UAW moved for summary judgment, and on February 10, 2000, Dana filed a cross motion for summary judgment. In its cross motion for summary judgment, Dana argued that because Arbitrator Glendon's interpretation of the neutrality provision diverged from Arbitrator Mittenthal's interpretation of the provision, Arbitrator Glendon's interpretation of the provision failed to draw its essence from the collective bargaining agreement and violated public policy. The district court concluded, however, that prior arbitration decisions are not binding on later arbitration decisions unless the collective bargaining agreement so stipulates. And the court further found that Arbitrator Glendon's interpretation of the neutrality provision drew its essence from the collective bargaining agreement. On May 12, 2000, the district court granted the UAW's motion for summary judgment and denied Dana's cross motion for summary judgment. Dana timely appeals.

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's grant of summary judgment in an arbitrated labor dispute. *Beacon Journal Publ'g Co. v. Akron Newspaper Guild, Local No. 7*, 114 F.3d 596, 599 (6th Cir. 1997). However, the scope of review is extremely limited. *Id.* "As long as the arbitrator's award draws its essence from the collective bargaining agreement, and is not merely his own brand of industrial justice, the award is legitimate." *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 36 (1987) (internal quotations omitted).

bargaining agreement only required that an arbitrator not reopen an earlier arbitration decision; the clause "does not so unequivocally import the principle of precedent into arbitral decisionmaking that Arbitrator Cass was obliged expressly to consider it lest his decision fail to draw its essence from the contract." *Id.*; *see also UAW Local Union No. 463 v. Weatherhead Co.*, 203 F.Supp. 612, 619 (N.D. Ohio 1962), *aff'd*, 316 F.2d 239 (6th Cir. 1963) (holding that the "final and binding" clause of the collective bargaining agreement made arbitration decisions "final and binding" on the parties only in regards to that decision).

We adopt the reasoning of the majority of other circuits to have examined this issue and hold that absent a contractual provision to the contrary, the preclusive effect of an earlier arbitration award is to be determined by the arbitrator. We also adopt the reasoning of the D.C. Circuit and hold that the "final and binding" clause of the Master Agreement only requires that an arbitrator not reopen an earlier arbitration decision.[9] As a practical matter, arbitrators should take into consideration prior arbitration decisions involving the same provision of the collective bargaining agreement.[10] In fact, in this case, Arbitrator Glendon specifically addressed Arbitrator Mittenthal's interpretation of the neutrality provision, and Arbitrator Glendon used Arbitrator Mittenthal's interpretation in sustaining three of the UAW's five charges. On the charge on which he explicitly departed from Arbitrator Mittenthal's interpretation, Arbitrator Glendon found that it was "not only

---

[9] It is not clear that Dana would have a case under either the Eighth Circuit's "strict factual identity" test, as described in *Trailways*, 807 F.2d 1416, or the Fifth Circuit's "material factual identity" test, as described in *Oil Workers*, 644 F.2d 1044. Dana argues that all five arbitration decisions arose out of "materially identical" facts. Appellant's Br. at 15. But although the neutrality provision was at issue in all the arbitrations, the actual conduct complained of by the UAW was different in each case.

[10] The Supreme Court has noted that "prior arbitration decisions may be relevant — both to other arbitrators and to the [NLRB] — in interpreting [collective] bargaining agreements." *Metropolitan Edison*, 460 U.S. at 708-09.

757, 765 (1983). Other circuits have held that the preclusive effect of an earlier arbitration award is a determination to be made by the arbitrator. *See, e.g., Bhd. of Maintenance of Way Employees v. Burlington N. R.R. Co.*, 24 F.3d 937, 940 (7th Cir. 1994) ("In the world of labor arbitration, the preclusive effect of the first arbitrator's decision is an issue for a later arbitrator to consider."); *Gen. Comm. of Adjustment, United Transp. Union, W. Md. Ry. Co. v. CSX R.R. Corp.*, 893 F.2d 584, 593 n.10 (3rd Cir. 1990) (quoting *Butler Armco Indep. Union v. Armco Inc.*, 701 F.2d 253, 255 (3rd Cir. 1983) ("absent contractual language to the contrary, one arbitrator's interpretation of a collective bargaining agreement is not binding on a subsequent arbitrator")); *Courier-Citizen Co. v. Boston Electrotypers Union No. 11*, 702 F.2d 273, 280 (1st Cir. 1983) ("Absent a contractual provision to the contrary, an arbitrator is free to decide that rigid adherence to a prior award would impair the process of flexibly resolving current or future disputes.").[8]   And a panel of the D.C. Circuit has specifically held that "where the agreement is silent, the arbitrator may decline to follow arbitral precedent when his judgment is that earlier decisions are erroneous." *Hotel Ass'n of Washington D.C., Inc. v. Hotel & Rest. Employees Union, Local 25*, 963 F.2d 388, 390 (D.C. Cir. 1992) (quotations omitted).

In *Hotel Ass'n*, the appealing party also argued that "when arbitration is specifically made final and binding, the arbitration decision becomes a term of the agreement and subsequent arbitrators must apply it as such." *Hotel Ass'n*, 963 F.2d at 390 (quotation omitted). In that case, the court held that the "final and binding" clause of the collective

---

[8]The Second Circuit has held that "while it is the usual practice of arbitrators to find prior awards final and binding, subsequent arbitrators may set aside or modify a previous award in certain circumstances," but the court also noted that if awards are inconsistent and a "need for resolving conflict is evident," the federal court should "select that interpretation which most nearly conforms to the intent of the parties." *Connecticut Light & Power Co. v. Local 420, Int'l Bhd. of Elec. Workers*, 718 F.2d 14, 20, 21 (2nd Cir. 1983).

---

The Supreme Court recently stated that "if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *Major League Baseball Players Ass'n v. Garvey*, 121 S. Ct. 1724, 1728 (2001) (quotation omitted). We have developed a four-prong test for determining when an arbitration award fails to draw its essence from the collective bargaining agreement; an award so fails when:  "(1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on general considerations of fairness and equity instead of the exact terms of the agreement." *MidMichigan Reg'l Med. Ctr.-Clare v. Prof'l Employees Div. of Local 79*, 183 F.3d 497, 502 (6th Cir. 1999) (quotation omitted).

## B.  Essence of the Collective Bargaining Agreement

On appeal, Dana argues that the arbitration award by Arbitrator Glendon fails to draw its essence from the Master Agreement because Arbitrator Glendon rejected the interpretation of the neutrality provision adopted by Arbitrator Mittenthal "in four prior, materially identical, arbitration proceedings." Appellant's Br. at 15. First, Dana claims that Arbitrator Mittenthal's interpretation of the neutrality provision had effectively become part of the contract or, that, at least, because the parties had renewed the provision without amendment, the interpretation indicated the parties' intent. In support of this proposition, Dana cites an Eighth Circuit case in which the court held that an arbitration award that found a company's "no beard" policy unreasonable did not draw its essence from the collective bargaining agreement. *Trailways Lines Inc. v. Trailways, Inc. Joint Council*, 807 F.2d 1416 (8th Cir. 1986). The court in that case concluded that the "no beard" policy was a reasonable standard of personal appearance under the terms of the collective bargaining agreement, as a previous arbitrator had determined, and the court noted that "[a]lthough an arbitrator

generally has the power to determine whether a prior award is to be given preclusive effect, courts have also recognized that the doctrine of res judicata may apply to arbitrations with strict factual identities." *Id*. at 1425 (quotation omitted). Dana also cites a Fifth Circuit case in which the court adopted a material factual identity test to determine if a prior arbitration award governed the conduct of parties to a collective bargaining agreement. *Oil Workers Int'l Union, Local No. 4-16000 v. Ethyl Corp.*, 644 F.2d 1044, 1050 (5th Cir. 1981).[5] And Dana cites Supreme Court dicta stating that "[w]here there is a clear and consistent pattern of arbitration decisions the parties, in some circumstances, may be said to have incorporated the decisions into their subsequent bargaining agreements." Appellant's Br. at 27-28 (citing *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 709 n.13 (1983)). Second, Dana claims that the fact that arbitration under the Master Agreement is "final and binding" mandates prospective application of standards developed in arbitration. Appellant's Br. at 20 (citing *Wilbur Chocolate Co., Inc. v. Bakery Workers Int'l Union, Local 464*, No.Civ.A. 86-5479, 1988 WL 33881 at *3 (E.D. Pa. March 31, 1988), *aff'd without opinion*, 862 F.2d 312 (3rd Cir. 1988)).

In concluding that Arbitrator Glendon was not bound by Arbitrator Mittenthal's interpretation of the neutrality provision, the district court judge stated that: "Although the issue is not entirely resolved in the case law, I conclude that the best approach is to refrain, as a general rule, from requiring an arbitrator to give res judicata, collateral estoppel, or other preclusive effect to decisions in earlier arbitrations." J.A. at 213 (Order Granting Pl.'s Mot. for Summ. J.). We

---

[5] The court in that case was concerned with prior arbitration awards being "sidestepped." *Oil Workers*, 644 F.2d at 1050. To avoid this problem, the court determined that "[c]onduct which merely differs in form from the actions which were the subject of the prior arbitration award cannot serve as an excuse for instituting new arbitration proceedings. On the other hand, actions by the company which differ materially from the previously condemned conduct and thus, are not substantially similar to that conduct, cannot constitute a 'like' violation of the previous award." *Id.*

agree. Although the Eighth Circuit and Fifth Circuit opinions cited by Dana do still appear to be good law in those circuits,[6] the majority of other circuits that have examined this issue have held that arbitrators in labor disputes are not bound by the decisions of prior arbitrators unless the collective bargaining agreement so stipulates.[7] The Supreme Court has stated that "[b]ecause the authority of arbitrators is a subject of collective bargaining, . . . the scope of the arbitrator's authority is itself a question of contract interpretation that the parties have delegated to the arbitrator." *W.R. Grace & Co. v. Local Union 759, Int'l Union of Rubber Workers*, 461 U.S.

---

[6] *Trailways*, 807 F.2d 1416, was distinguished in *American Nat'l Can Co. v. United Steelworkers*, 120 F.3d 886, 891-92 (8th Cir. 1997) (finding that in both *Trailways* and *Wilbur Chocolate* the arbitration award was reversed primarily because the award did not draw its essence from the collective bargaining agreement — not just because it did not take into account a prior award).

[7] We have not previously addressed this issue. In a case in 1963, we affirmed without comment a district court opinion in which the issue was mentioned. *UAW Local Union No. 463 v. Weatherhead Co.*, 316 F.2d 239 (6th Cir.), *cert. denied*, 375 U.S. 827 (1963). The district court in that case held that an arbitrator's decision on a question of interpretation of a collective bargaining agreement did not preclude rearbitration of that question, even though arbitration was contractually stipulated to be "final and binding," and the court noted that:

> Although the defendant dwells at length upon the applicability of the doctrines of res judicata and collateral estoppel, I am of the firm conviction that these doctrines do not apply in this case. These doctrines extend only to the facts in issue as they existed at the time the arbitrator's decision was rendered and there can be no doubt that the Nauman grievance is settled finally and cannot be relitigated.

*UAW Local Union No. 463 v. Weatherhead Co.*, 203 F.Supp. 612, 619 (N.D. Ohio 1962). However, the district court also noted that "though the doctrines of res judicata and collateral estoppel *may* apply to an arbitrator's decision they are not applicable here." *Id.* (emphasis added). Such inconclusive mention of the issue in a district court opinion in a case decided before the seminal Supreme Court opinion in *Misco*, 484 U.S. 29, is of limited assistance in deciding this case; at most, it suggests support for our holding *infra* that contractual language as to the "final and binding" nature of an arbitration decision does not determine the precedential effect of the decision on later arbitration decisions.